Sutliff, J.
It is claimed by counsel of the defendants, that while part of the record may seem to sustain the first assignment, the further instruction of the court, that all the receipts were to be considered in connection with the other evidence, should be regarded as qualifying the preceding remarks of the court in relation to the legal construction of the receipts, as separate items of evidence.
We do not regard this instruction of the court, to consider *317 the receipts in connection with the other evidence in the case, and from the whole evidence to determine whether the general ownership was in Bartlett & May, as qualifying the proceeding instruction given as to the legal effect of the receipts. The court had already told the jury, “ that the receipts were evidence of a special ownership only, in the plaintiffs, with the right of immediate possession . . as against Bartlett & May;” and that on their face they “tend to prove no more.” There is nothing in the subsequent instructions of the court varying or qualifying this legal construction so given of the receipts. The jury were only told to take into consideration the other evidence with the evidence of the receipts, and, from all the evidence, to determine whether the general ownership was in Bartlett & May; and that if they so found, and that the receipts were given to secure the plaintiffs a lien upon the property, merely, they could not recover.
The question then arises ; was the instruction of the court given to the jury as to the legal effect of the receipts erroneous ?
Receipts of this kind are, likebills of lading, drafts, bills of exchange, etc., instruments sui generis; and such, from long and general use in commerce and trade, have come to have a well understood import among business men. All those various instruments speak a well understood language among commercial men, which ought not to be confounded, or perhaps even qualified by a strict construction of the literal and grammatical meaning of the words in which expressed. Instruments of the different kinds referred to, are frequently somewhat variant, and are still, by commercial men recognized as of the same import and validity, and so they are very properly regarded in law. The receipts in this case are in some particulars variant from each other ; and yet we have no doubt they would all be recognized by commercial men, as of like import and equal validity as warehouse receipts. And if so, they as absolutely transfer the general property of the goods and chattels therein expressed, as would a bill of sale. They are a kind of instrument extensively used by commercial men, as the most convenient mode of transfer and *318 constructive delivery of property, and facilitating the ready realization of the price of products by the producer remote from market. Public policy, as well as respect to good faith, requires that those like other instruments of commerce, should be so regarded in courts, as not to unjustly impair confidence in them elsewhere. And this view of the legal effect of such instruments, we think fully sustained by the authorities cited by counsel; and especially by the case of Gibson v. Stevens, 8 How. Rep. 384.
Indeed we do not understand counsel to insist, that an instrument of a somewhat similar tenor to those, one strictly within the form of a warehouse receipt, might not, in its legal effect, operate to transfer the property to the holder, so as to protect it against an attachment or levy, as the property of the former owner. But it is particularly objected to such operative effect of these receipts, first, that Bartlett & May continued in the actual possession of the property; and second, that the receipts upon their face, recite the fact that the plaintiffs had a lien thereon.
The fact of. the party giving the receipts having continued in possession, if the instrument operated to transfer the legal title, the right of property, certainly could not of itself divest the holder of such title. If the writings were evidence of a delivery by the plaintiffs to Bartlett & May as bailees of the property, and an undertaking on their part to hold the same as bailees for the plaintiffs, as their property, the fact of the continuance of this relation of the respective ’parties to the property, for six months, could no more chánge their relations, than would the continuance of such relation for six days, or even six hours. There is then, no question arising beyond that of the legal import of the warehouse receipts at the time of their execution.
It only remains, therefore, to ascertain whether the effect of these warehouse receipts to vest the general property and right of possession in the plaintiffs was destroyed, or so far qualified by the concluding recital, as to change the instruments in their character. The recital, after the stipulation therein, “ to hold irrevocably subject to their order,” is in *319 these words: “ they having a lien thereon for the full cost of the same.” What, then, is the obvious meaning of this recital ? It can not be reasonably understood to imply more than this — that the recital is the reason and consideration of the relation of the parties to the property being so fixed as expressed by the instrument. Nothing further, indeed, is, perhaps, claimed as the import of the recital. But it is insisted that, by giving such effect to the recital, the instrument thereby necessarily becomes a mortgage, or a mere conveyance intended to operate as a mortgage of goods and chattels, and so falls within the statute (of April 1, 1846), requiring the same to be deposited with the clerk or recorder in order to give it validity, in such a case. The language of the recital does not render logical or rational such a conclusion. In the first place, the lien is not stated to be for a definite sum of money, and, as usual in mortgages, a sum less than the value of the property; and, again, it is to be remarked that the lien is expressed to be for the full cost of the property, etc. One of two conclusions would seem, therefore, more naturally inferable from these recitals : either that the property had been purchased and procured by the money of the plaintiffs, and so the legal title was passed to them in accordance with their equitable rights; or that the plaintiffs, being the owners, were to retain the general ownership until their bailees should pay them the full cost, or agreed purchase price of the same.
There is, then, nothing in the recitals contained in these receipts, that Gibson, Stockwell & Co. had a “ lien thereon for the full cost of the same,” etc., inconsistent with the agreement of the receiptors to hold the property as bailees; nor in the least impairing the effect of the instruments as warehouse receipts.
. But it is insisted that the deposition of Miller makes it evident that the receipts were given merely as security; and that the deposition with the receipts clearly shows their execution to have been, intended only to operate as a mortgage to secure the claim of the plaintiffs for advancements. We do not so understand the proof. The deposition shows clearly *320 that it was not to secure an existing indebtedness merely, that the warehouse receipts were given; but on the contrary, that the plaintiffs, under a previous and subsisting contract, furnished and advanced the money for the purchase of the property upon an agreement on the part of Bartlett & May to so pass to them the title thereto, and to allow them to rt • ceive from the sale thereof, their advancements and commission ; and that the warehouse receipts were executed in good faith, in pursuance of the contract. It is not presumable that the plaintiffs advanced their money, with the incidental risk, to purchase and procure the property prepared for shipment at a distant and remote point from market, and there took a consignment of it, holding the general property — not for carrying out the contemplated operation, but merely to secure the reimbursement of their money, and a safe abandonment of their enterprise. Such a construction of these instruments would not only be inconsistent with their generally received acceptation among commercial men, and inconsistent with their language, but from the history of the transaction, as shown by the proof, it would be to annul the actual contract, and defeat the bona fide executed agreement, and transactions of the parties.
We think, therefore, the court erred in its instructions to the jury, that the warehouse receipts did not “tend to prove that the plaintiffs had a general ownership in the property.”
Again, it is urged in argument, that, as the proof tended to show that Bartlett and May had an interest in the property, other than that of bailees, the levy might be justified as a levy upon their interest, notwithstanding the general property in the chattels, and the right of possesion belonged to the plaintiffs. And in support of the proposition, we are referred to the case of Wheeler and others v. M'Farland, 10 Wend. Rep., 318. But we do not recognize any authority in that case for the proposition. That was a case where the general property was in the judgment defendant, subject to a lien in favor of the party holding possession. If, in this case, the execution had been against the plaintiffs, and the bailees, Bartlett & May, had asserted a special lien for warehouse charges upon *321 the property as an objection to the levy upon the interest of the general owners, or to a levy and sale subject to such lien, that case would be in point to answer such an objection to such a levy. But it by no means follows, that from the fact that the goods and chattels in which the judgment defendant has the general property subject to existing liens, may be-levied upon to satisfy such judgment, that, therefore, goods and chattels in which he has not the general property, but only an equitable interest in, or a lien upon, can also be seized in execution for the satisfaction of such judgment. But in the case before us, Bartlett & May had not even a lien or special property in the goods, which authorized them to hold possession of the goods as against the plaintiffs; their interest was only an equitable and contingent one, and in nowise subject to a levy.
It is also claimed by defendants in error, that even admitting the levy to have been made without authority, inasmuch as the return of the sheriff states the levy to have been made-upon “the interest, right and claim” of Bartlett & May in the goods and chattels merely, and as the goods and chattels were not actually removed by the sheriff, the record does not show any right of action thereby arising to the plaintiffs. It is true the return of the sheriff recites the levy to have been made upon the interest, right and claim of' Bartlett & May in the property; and the return also recites that after so having levied on the 4th of January, that on the 27th of the same month "the levy on the personal property” was released. But apart from the sheriff’s return of the release of “ the levy on the personal property,” the proof is that the levy was made-in the usual form, by the sheriff’s going, to the property and, in the usual manner of making a levy, asserting, by his conduct, such a seizure, as consistent with the idea of asserting a right of possession, and thus reducing the chattels to the dominion of the law. The chattels were evidently by the sheriff regarded from the time of the levy until its release, as in his possession. And as this claim of dominion on the part of the sheriff, with the power to exercise it, amounted, in law, to such a seizure as constitutes a levy, we think the seizure *322 of the personal property itself by force of the levy on the part of the defendants, they having directed the levy, is fairly shown by the record.
And there is nothing in the record to show that the usual force and effect of a levy upon chattels did not obtain in this case. After the seizure by the sheriff until the release of his levy, the property remained, in contemplation of law, as absolutely in the possession of the sheriff, as it would have done, if being susceptible of convenient removal it had been actually removed by him at the time of so making the levy.
The plaintiffs, therefore, having the general property in the goods, and the right of possession, it follows that this seizure and holding of the property by the defendants from the plaintiffs, was to their prejudice. It was utterly depriving them of their property for that length of time. The property is shown to have been of value. If the deprivation had been permanent and total, the plaintiffs, holding the general property, would have been entitled to recover for its full value; and the deprivation being shown only for a limited time, and so only partial, the plaintiffs were entitled to recover accordingly, a just compensation for such deprivation. The Avrongful taking of the plaintiffs’ property constituted the gist of their cause of action; and its subsequent return might properly be regarded in mitigation of damages. It is true that the proof does not show, definitely, any particular amount of damages sustained by the plaintiffs; but the evidence doen tend to show a right of recovery in the plaintiffs.
The judgment of the district court must therefore be rr ■ versed, and the cause remanded for further proceedings.

Judgment accordingly.

Brinkerhoee, C.J., and Scott, Peck and Gholson, J7 .concurred.